RECEIVED
USDC CLERK, CHARLESTON, SC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

2006 JUN 19  A 11: 15

Hattie Mae Greene,                )    C. A. No. 2:05-0811-DCN-RSC
                                  )
              Plaintiff,          )
                                  )
       -versus-                   )    **REPORT AND RECOMMENDATION**
                                  )
Quest Diagnostics Clinical        )
Laboratories, Inc.,               )
                                  )
              Defendant.          )

This employment action brought pursuant to the court's
diversity jurisdiction is before the undersigned United States
Magistrate Judge for a report and recommendation on the
defendant's motion for summary judgment.  28 U.S.C. § 636(b).

The plaintiff, Hattie Mae Greene, sued her former employer,
Quest Diagnostics Clinical Laboratories, Inc. (Quest), on
December 6, 2004, in state court and Quest removed the action to
this court March 16, 2005.  Greene filed her third amended
complaint on September 28, 2005, and Quest filed the instant
motion on December 16, 2005.  Greene opposed the motion on
January 13, 2006, and Quest filed a reply on January 26, 2006.
Oral argument was had before the undersigned on February 8, 2006,
and mediation of the dispute was unsuccessful.  Hence, it appears
consideration of the motion is appropriate.

Quest terminated Greene's employment as a phlebotomist on
February 13, 2004, for, according to Quest, poor performance and

1

multiple violations of Quest's policies and procedures.  Greene, however, contends that Quest terminated her employment as a result of internal reports that she made concerning alleged compliance issues.  Greene brings solely the following state law causes of action[1]:

1. Wrongful discharge in violation of public policy;

2. Breach of employment contract;

3. Breach of contract accompanied by a fraudulent act.

The defendant argued that it is entitled to summary judgement for the following reasons:

1.  Plaintiff was an at-will employee of Quest Diagnostics and therefore subject to termination for any reason and at any time, with or without cause.

2.  Plaintiff has not alleged the violation of a clear mandate of public policy recognized as a public policy exception to the at-will employment doctrine in South Carolina.

3.  Even if Plaintiff has sufficiently alleged a clear mandate of public policy, Plaintiff's termination did not violate the alleged public policy.

4.  No contract of employment, express or implied, existed between Plaintiff and Quest Diagnostics.

---

[1] In her brief in opposition to the motion, Greene withdrew her cause of action for breach of the implied contract of good faith and fair dealing.

2

5.  Even if Plaintiff can establish a contract of employment.  Quest Diagnostics had a reasonable good faith belief that sufficient cause existed for Plaintiff's termination.

6.  Even if Plaintiff can establish the existence and breach of a contract of employment, Plaintiff cannot make out a prima facie case for breach of contract accompanied by fraudulent act.

### SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c).  The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986).  All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "[W]here the record taken as a whole

3

could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 242 (4th Cir. 1982).

### FACTS

The facts, either undisputed, or according to the plaintiff as the non-moving party with all reasonable inferences therefrom, to the extent supported by the record, are as follow.

Greene was initially employed in 1997 by Quest's predecessor, SmithKline Beecham, and became a phlebotomist in 1998. Quest took over SmithKline's operations in 1999, and Greene continued as a phlebotomist. As a phlebotomist, Greene drew blood from patients, filled out paperwork which identified the patient and the ordering doctor, entered the information into a computer, and got the sample ready to be picked up by a courier.

4

Quest phlebotomists worked in two different kinds of situations.  First, Quest would send its phlebotomist to various physician's offices to work, known as an "In Office Phlebotomy" site (IOP).  Quest would enter into written contracts with these doctor's offices; the doctor's offices would then become Quest's clients.  When this happened, the phlebotomist would daily work at the physician's office, but was still subject to all of Quest's rules and regulations.  At the IOP physician's office the phlebotomist would be called upon to draw blood from the doctor's patients.  Quest would then collect the specimen and bill for it.

Second, the phlebotomist could be assigned to work at Quest's Patient Service Center (PSC).  The PSC is an office run by Quest where doctors can send their patients to have their blood drawn.  At all times relevant here, Quest had a single PSC in Charleston.

Greene worked first at Low Country Internal Medicine's IOP until she was transferred to the IOP of Carolina Women's Care (CWC).  She was later transferred to the Quest PSC and her employment was subsequently terminated on February 13, 2004.

In 2000, Kimberly Cashwell became the supervisor over the defendant's operations in Charleston and Myrtle Beach and had about 20 employees working under her, including Greene.  Cashwell in turn reported to Toni Seeley, the manager for South Carolina. Cashwell worked out of the PSC in Charleston.  Seeley worked out

of Columbia, South Carolina.  Cashwell gave Greene her reviews in 2000, 2001, and 2002.  All were a 3 on a possible 5 scale, regarded as good reviews.

Beyond the undisputed facts, the parties have two very different versions of why the plaintiff was fired:

### QUEST'S VERSION

Quest believes it was compelled to fire Greene because she was insubordinate, sloppy, lazy, and endangered patient care. Further, Quest's clients demanded that she be removed and threatened to take their business elsewhere if she was not removed.  Quest points to the following incidents:

On April 1, 2003, Cashwell made a routine site visit at the Low Country IOP site where Greene worked.  While there, the Low Country office manager who was not an employee of the defendant, reported among other things that (a) Greene had highlighted a Quest confidential break policy and given it to her, (b) Greene's lunch breaks were becoming longer and longer and would often last an hour instead of the allotted 30 minutes, (c) in general, Greene would take her breaks regardless of the workload at the time and refused to be flexible about when she took her breaks, (d) Greene arrived late and/or left early, (e) Greene used their copier to make voluminous copies of Greene's personal papers; and (f) Greene refused to lower the ring volume on her cell phone, despite several requests to do so.  Two days later, on April 3,

2003, the Low Country office manager called both Cashwell and her boss, Toni Seeley, and told them that she wanted Greene removed from the office as soon as possible.

On April 9, 2003, Greene received a Written Notice of Performance for exercising poor judgment in providing the Quest confidential break policy to the office manager. Despite Greene's notation on the Written Notice of Performance that she was unaware the policy was confidential, the policy itself was marked "Confidential: Authorized for internal use only" and in larger print, "CONFIDENTAL" at the bottom of the page.

Greene was reassigned from Low Country's IOP to CWC's IOP. On January 14, 2004, the Quest sales agent responsible for CWC's IOP circulated an email to management at Quest which informed management that the CWC's office manager reported to him that they were unhappy with Greene's work. On January 19 the sales agent emailed again that he was able to obtain additional details regarding the problems. CWC's complaints about Greene included that she was talking on her cell phone while a patient was present, playing the radio loudly and singing in front of patients, reading personal material at times when there was work waiting, and taking food which did not belong to her from the client's office. Cashwell and Toni Seeley received the email. Seeley spoke to Cashwell and recommended that they transfer Greene from CWC. By late morning, Alison Mercer, Senior Human

7

Resources Generalist in Atlanta, had also circulated an email indicating that Greene should be temporarily removed from the site.  About 3 p.m., that same day Cashwell and Mercer had a conversation about Greene's performance at CWC.  Cashwell and Mercer had a conference call with Greene at that time.

About two weeks later, on January 28, 2004, Greene was reassigned for 60 days to the PSC, where Cashwell maintained her office, so that Greene could be more closely monitored.  Greene was given a "Written Notice of Performance" which warned that if her performance did not improve, her employment could be terminated.

Nonetheless, while at the PSC, Greene was found to be improperly using a house account number, violating the policy on the number of times a phlebotomist could attempt to draw blood from a patient, using a competitor's requisition form, not responding to the supervisor's instructions to pick up the pace in processing patients, and exclaiming "Jesus Christ" in front of a patient when she made a computer keystroke error.  Mercer and Cashwell discussed these problems with Greene on February 11, 2004, and placed her on administrative leave.

After consulting with the Regional Human Resources Director, Cathy Lussiana, Mercer made the decision to terminate Greene's employment.  On February 13, 2004, a final meeting was held between Greene, Cashwell, and Mercer at which Greene was

8

terminated.  The reasons for the termination were documented in a letter from Mercer to Lisa Beerman as follows:

> •    Far exceeding allowable errors in 12—month period under Phlebotomy Errors Policy    —
> •    Causing HIPAA violations by entering patient under incorrect client code, resulting in patient test results going to wrong doctor, as well as delay in patient care as we had to re-route results to correct doctor
> •    Failing to follow supervisors repeated instructions to help service the patients in PSC
> •    Admitting to knowing SOP for total number of venipuncture attempts allowed (2), yet willfully/knowingly violated policy
> •    Numerous patients put under "House Account" requisition instead of the doctor s active account, resulting in delay of test results to client, delay of patient care, and customer service issues Hattie admitted that patients came in the door with requisitions containing the pre—printed client number, but could not adequately explain why she put so many under the "House Account" requisition; house req should only be use when client has no account with us
> •    Used LabCorp requisition for drug screen
> •    Inappropriate language in front of patient
> •    Additionally, there was an incident with specimens that couldn't be sent to Atlanta for processing because Hattie apparently lost the information while keying it in (delay of testing, patient care impact, client relations impact); Kim addressed w/Hattie at the time, but this particular issue was not raised in the call today.

Ex. B to defendant's memorandum.

Quest points to it's evidence relating to the wrongful termination in violation of public policy claim, as follows. Greene raised compliance issues on April 9, 2003, when Cashwell met with her to discuss issues raised by the manager at the Low Country IOP.  Greene specifically said that she had been asked to

file one or more patients' charts and clean the kitchen. Greene raised another complaint in November or December 2003 that she was being asked to answer the phone at CWC and place information on requisition forms. Greene complained to Quest's compliance office in Atlanta, and Greene's concerns were addressed with CWC.

At some point in January, after Greene was told to report to the PSC, she complained to Cashwell that another phlebotomist added a diagnosis code known as an ICD-9 code to a requisition form. Greene also raised compliance issues with Mercer in a phone conference on January 26.

Mercer was aware of the Low Country report. Cashwell was aware of the reports, except the January 26 report to Mercer. (Cashwell Tr. 150). Mercer and Cashwell were not angry over the reports and took no action against Greene because of them.

### GREENE'S VERSION

While Greene was assigned at Low Country, the office manager, the staff, and some of the physicians regularly asked her to pull charts for them, to clean the kitchen, and to enter ICD-9 codes on requisition forms, but she always declined. The ICD-9 diagnosis code is entered by a physician or his authorized staff, on a test requisition form and the phlebotomist needed the ICD-9 code so that he or she could know what kind of blood work was to be performed. Cashwell deposed that phlebotomists cannot enter codes because they are not physicians and they do not

10

diagnose patients.  Cashwell agreed that this admonition is included in Quest's Compliance Policy.  (Cashwell dep. at 129).

Greene also observed that a Quest phlebotomist had entered the diagnosis codes on the forms.  Greene believes that the doctors and their staff did not like it when she refused to enter diagnosis codes.  According to Greene, she verbally reported violations to Cashwell and Seeley when they occurred.

When Cashwell confronted Greene about Greene's having given a copy of Quest's confidential break policy to the office manager at Low Country on April 1, 2004, Greene told Cashwell then that staff members at Low Country were asking her to clean the kitchen, pull charts, and enter ICD-9 codes.  Cashwell met with the Low Country office manager about Greene's complaint and at that meeting the office manager asked that Greene be removed from the Low Country office.

At Carolina Women's Care, Greene again saw at least one phlehotomist from Quest enter ICD-9 diagnosis codes on the requisition forms.  Greene again made verbal complaints about this to Cashwell and Seeley.  In addition, Carolina Women's Care wanted Greene to answer phones, to use the office computers to get patient information, and to fill out requisition forms. Greene believed that these requests and the issue regarding diagnosis codes raised compliance and HIPAA issues.  Greene advised the office manager there that she could not perform these

11

tasks, and she reported the requests to Cashwell.  As a result of her report to Cashwell, a conference call was held in December 2004 with Greene, Cashwell, Mercer, and Neicy Johnson, a Quest compliance officer, during which call Greene repeated the report to Cashwell about Carolina Women's Care's requests, and that she saw other phlebotomists enter ICD-9 diagnosis codes.

On December 17 or 18, 2003, Cashwell met with a representative of Carolina Women's Care about the potential violations and the representative acknowledged only that Greene had been asked to answer phones.

In mid-January 2004, Quest moved Greene from Carolina Women's Care to the PCS.  At the PCS, Greene again saw several of Quest's phlebotomists adding ICD-9 diagnosis codes to requisition forms and another phlebotomist, Robin Masters, advised Greene to enter a ICD-9 code on a requisition forms.  (Ex. 1, plf. depo. p. 90).  Dr. Mughelli told Greene that other phlebotomists at Quest were coding for them and that they were going to send their "clients" someplace else if she would not do the coding.  Greene refused to do the coding and reported the doctor to Cashwell. (Ex. 1, plf. depo. p. 103).

On Monday, January 19, 2004, Greene saw a lead phlebotomist at the PCS add an ICD-9 code to a requisition form and immediately reported it to Cashwell.  On January 26, 2004, Greene telephoned Mercer and reported that Quest phlebotomists were

12

adding ICD-9 diagnostic codes to requisition forms. Mercer thanked Greene for the call and told her she would investigate. Shortly thereafter, compliance officer Johnson telephoned Cashwell and advised her that Greene had just made a complaint. (Ex. 2, K. Cashwell depo. pp. 115-120). As a result, Cashwell and another employee pulled and reviewed all of the over 500 requisition forms generated in the month of January 2004 to ensure that phlebotomists did not engage in improper diagnosis coding. Greene deposed that after reviewing the 500 forms Cashwell was very impatient and abrupt with her, hung up the phone on her, and would not personally communicate with her but only relayed information to her through other phlebotomists. (Ex. 1, plf. depo. p. 161).

On January 27, 2004, Cashwell gave Greene another written warning. That warning dealt with complaints which arose while Greene worked at Carolina Women's Care and included allegations that she answered a personal call on her cell phone, played her radio too loudly, read personal material, and took other persons' food from the client's kitchen.

On or about February 9, 2004, Greene was seated behind a counter next to the patient waiting room where a patient was present when she made a keystroke error on the computer she was using. Greene's error caused her to lose the data she had already entered and Greene said "Jesus Christ". Cashwell heard

her.  The next day, February 10, 2004, Cashwell and Mercer suspended Greene for using the language and for an incident where Greene stuck a patient three times in order to draw blood, which was prohibited.  Greene deposed that she had heard several phlebotomists and a courier say "cuss words" in front of Cashwell when patients were present without being disciplined.

On February 13, 2004, Cashwell and Mercer terminated Greene and told her it was for her language in front of a patient as well as for other performance problems.  According to Greene, when she was terminated, she was told of some but not all of the reasons Quest gave for the decision to fire her.

## FIRST CAUSE OF ACTION

Greene's theory is that the defendant wrongfully terminated her employment in violation of the public policy of South Carolina when she made internal complaints to Quest that Quest's employees were not complying with various laws and regulations impacting health care providers in South Carolina, and also because Quest's client(s) wanted Greene terminated because she made internal complaints to Quest about the client's employees noncompliance with various laws and regulations impacting health care providers in South Carolina.[2]  Greene urges the court to

---

[2] In her complaint, Greene contended that she was terminated for complaining about employees engaging in the unauthorized practice of medicine or performing functions and tasks reserved for physicians.  She changed her position in her brief in opposition to the defendant's motion and asserted that she was

14

recognize for the first time a common law South Carolina tort, namely, Wrongful Termination in violation of the public policy that an employee not be terminated for making internal complaints of violations of laws governing medical providers by employees of the employer's clients, and of the employer's own employees.

South Carolina courts have long recognized the doctrine of employment at-will. See, e.g., Shealy v. Fowler, 188 S.E. 499 (S.C. 1936). Under this doctrine, which is the general rule in South Carolina, an employer may discharge an employee for good reason, bad reason, or no reason at all without incurring liability. Culler v. Blue Ridge Elec. Coop., Inc., 422 S.E.2d 91, 91 (S.C. 1992); Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 214 (S.C. 1985). The South Carolina Supreme Court, however, has recognized two limited situations where the employer's discharge of an at-will employee may give rise to a cause of action for wrongful discharge. First, a discharged employee may maintain an action against his or her employer where the provisions in an employee handbook alter the employee's

---

terminated for refusing to break the law, as Quest ordered. (Pl. brief at 12). At oral argument before the undersigned, Greene conceded that she was not claiming that she was terminated for refusing Quest's order that she break the law. Rather at that time her contention morphed into its final form for summary judgment purposes: Plaintiff was terminated by Quest because Quest's customer(s) wanted Greene terminated because she made internal complaints to Quest about the customer's employees noncompliance with various laws and regulations impacting health care providers in South Carolina.

at-will status.  <u>Small v. Springs Industries, Inc.</u>, 357 S.E.2d
452 (S.C. 1987).  Second, a cause of action for wrongful
discharge arises where the employee's discharge violates a clear
mandate of public policy.  <u>Ludwick</u>, 337 S.E.2d at 216.  Greene
claims she is entitled to recovery under both causes of action.
Her wrongful termination in violation of pubic policy is her
first cause of action and will be considered here first.

In <u>Ludwick</u>, the plaintiff was forced to choose between
honoring a subpoena and keeping her job.  Ludwick obeyed the
subpoena and was fired.  <u>Id.</u> at 214.  The supreme court held that
"the public policy exception is invoked when an employer requires
an at-will employee, as a condition of retaining employment, to
violate the law."  <u>Id.</u> at 216.  Broadly interpreted, <u>Ludwick</u>
carries the potential for far-reaching results.  In subsequent
cases, however, the supreme court has been careful to greatly
limit <u>Ludwick</u>.  For example, in <u>Epps v. Clarendon County</u>, the
supreme court refused to extend the <u>Ludwick</u> exception to
situations where the employee has an existing remedy for a
discharge which allegedly violates rights other than the right to
the employment itself.  405 S.E.2d 386 (S.C. 1991) (plaintiff
possessed action against county for infringement of his
constitutional rights pursuant to Title 42 U.S.C. § 1983).  In
<u>Dockins v. Ingles Markets, Inc.</u>, 413 S.E.2d 18 (S.C. 1992), the
court held <u>Ludwick</u> was not applicable where the plaintiff claimed

16

he was discharged in retaliation for alleging Fair Labor

Standards Act violations against his employer.  Again the court

placed emphasis upon the fact that the plaintiff had an existing

remedy under the Fair Labor Standards Act.  Id. at 19.  Moreover,

in again refusing to expand the Ludwick exception, the supreme

court observed, "This public policy exception to the termination

of at-will employees has not been extended beyond situations

where the termination is in retaliation for an employee's refusal

to violate the law at the direction of his employer."  Id. at 18,

(citing Epps v. Clarendon County, 405 S.E.2d 386 (S.C. 1991).

Epps and Dockins seemed to limit the public policy exception

to only those situations where the employer forces the employee

to choose between possible jail sentence or termination, and many

courts so held.  See, e.g., Miller v. Fairfield Communities,

Inc., 382 S.E.2d 16 (S.C. Ct. App. 1989); Merck v. Advance

Drainage Systems, Inc., 921 F.2d 549 (4th Cir. 1990).  In Culler

v. Blue Ridge Electric Coop., Inc., 422 S.E.2d 91 (S.C. 1992),

however, the supreme court rejected such a narrow interpretation

instead holding that the public policy exception in Ludwick

extends to any "violation of a clear mandate of public policy."

Id. at 92.  With that clarification, the court went on to find

that Ludwick's public policy exception included legislatively

defined "Crimes Against Public Policy" located in Chapter 17 of

Title 16 of the South Carolina Code.  Id. at 93.  Culler claimed

17

he was terminated for refusing to contribute to a political action fund. Section 16-17-560 makes it a "crime against public policy" to fire any person because of their political beliefs. S.C. Code Ann. § 16-17-560. The court held that if Culler was terminated for refusing to contribute to a political action fund, he would have a cause of action for wrongful termination under Ludwick. Id.

A review of Ludwick and its progeny reveals that Greene's termination does not fall within the public policy exception to employment at-will. She does not claim that her termination was in retaliation for her refusal to disobey the law, and she has otherwise failed to put forth a clear mandate of public policy that was violated by her termination. Greene argues that firing her for complaining to her employer about others' failures to follow the generalized regulations and laws pertaining to health care providers violates public policy. Generally speaking, public health certainly implicates public policy concerns as evidenced by numerous federal and state laws which seek to promote good health care. However, as discussed above, the South Carolina Supreme Court has been careful to limit the scope of the Ludwick public policy exception, so that general public policy concerns fall short of the public policy mandated. See, Culler, 422 S.E.2d 91; Dockins, 413 S.E.2d 18; Epps, 405 S.E.2d 386. As Culler establishes, a litigant must demonstrate more than a mere

relationship between an employer's conduct and a general notion of public policy.  Only those employer actions which violate a clear mandate of public policy fall within the exception to employment at will.  To date, the South Carolina Supreme Court has only been willing to recognize as a public policy "mandate" something tantamount to a judicial or legislative declaration of public policy.  See, Culler, 422 S.E.2d at 92-93.

Greene has failed to cite to any judicial or legislative statements of public policy dealing with health care, but instead implicitly urges the court to recognize on its own such a public policy.  The Fourth Circuit, however, has cautioned that ordinarily courts should not broaden public policy: "Courts must use care in creating new public policy.... [D]eclaration of public policy is normally the function of the legislative branch ... unless deducible in the given circumstances from constitutional or statutory provisions, [public policy] should be accepted as a basis of a judicial determination, if at all, only with the utmost circumspection."  Adler v. American Standard Corp., 830 F.2d 1303, 1306-07 (4th Cir. 1987).

Further, despite its language in Garner v. Morrison Knudsen Corp., 456 S.E.2d 907 (S.C. 1995), stating that the public policy exception has never been limited to situations where an employer required an employee to violate a criminal law or situations where the reasons for the employee's termination was itself a

violation of criminal law, the South Carolina Supreme Court has
not expressly recognized a public policy "whistleblower" type
claim, the claim brought here.  Additionally, the lower courts
have been extremely hesitant to broaden the range of possible
wrongful termination claims generally.  See, Merck v. Advanced
Drainage Systems, Inc., 921 F.2d 549, 554 (4th Cir. 1990)
(holding the public policy exception recognized in Ludwick "is to
be very narrowly applied."); Long v. Newberry Electric
Cooperative, Inc., No. C.A. 2001-CP-36-18, 2002 WL 1362081, at 8
(S.C. Com. Pl. Feb. 4, 2002) (declining to extend the public
policy exception to claim of retaliatory discharge for reporting
safety violations); Antley v. Shepard, 532 S.E.2d 294 (S.C. App.
2000) (declining to extend exception to situations where employee
is terminated for refusing to comply with a directive which she
simply believed  would require her to violate the law); Dockins
v. Ingles Markets, Inc., 413 S.E.2d 18 (S.C. 1992) (declining to
extend exception to retaliatory discharge claim where statute
provided a remedy).

In addition to relying upon Garner, Greene relies on two
court of appeals decisions, Keiger v. Citgo Petroleum, Inc., 482
S.E.2d 792 (S.C. App. 1997), and Evans v. Taylor Made Sandwich
Company, 522 S.E.2d 350 (S.C. App. 1999), to support her
position.  Those cases all involved an external complaint or a
threat to make an external complaint, unlike the strictly

20

internal complaints presented in the instant case.  See, Garner,
456 S.E.2d at 908; Keiger, 482 S.E.2d at 793; Evans, 522 S.E.2d
at 351.  Additionally, Garner and Keiger did not hold that a
public policy claim was available on the facts in those cases.
In Garner, the court was faced with a motion to dismiss a public
policy claim based on retaliatory discharge for reporting to
government agencies the plaintiff's concerns about safety at the
nuclear energy plant at which he performed work.  Id. at 908.
The court held that it was inappropriate to dismiss the case in
that procedural posture because the facts of the case presented a
"novel issue."  Id. at 909.  However, the court never ruled on
whether the public policy exception actually applied to the facts
of that case.

   The exact same situation was faced by the South Carolina
Court of Appeals in Keiger where the employee threatened to file
a formal complaint with the labor board regarding a reduction in
her wages, and the court decided that the issue of whether the
public policy exception applied to the case was a "novel issue,"
such that disposing of the case on a motion to dismiss was
inappropriate.  Id. at 793.  Unlike those cases, Greene's case
has been discovered and reached the summary judgment stage of the
litigation.

   Evans v. Taylor Made Sandwich Company is the only case in
which the South Carolina appellate courts have shown any

inclination to extend the public policy exception in wrongful discharge actions beyond its traditional boundaries. In <u>Evans</u>, the employees who brought the wrongful termination claims, Evans and Eagleton, had filed complaints with the South Carolina Department of Labor and instigated that department's investigation. <u>Id.</u> at 350, 353. In <u>Evans</u>, one employee was fired one hour after the investigation into their complaints began and the other employee was fired as soon as she next returned to work. See, <u>id.</u> at 354. Additionally, the employer's proffered reason for the discharges, excessive absenteeism, was found by the jury to be pretext because the employer knew about the  absenteeism problem weeks prior to the termination, but only took action after the commencement of the investigation. See, <u>id.</u>

Here, Greene's facts are substantially different from that of the employees' in <u>Evans</u>. Greene's complaints were strictly internal complaints and no outside investigation was done as a result of her complaints.[3]  Furthermore, Greene's compliance

_____

[3] Greene did not make a complaint with any law enforcement agency or regulator or such and, indeed, did not even threaten to do so.  It has been argued that "Courts should require an affirmative showing that an employee's internal whistleblowing conduct was reasonably likely to prevent the alleged misconduct. If courts are unwilling to impose this reasonable element of proof on former employees, the unclean hands doctrine should apply to bar wrongful termination claims of purported internal whistleblowers whose complaints were not made in a manner reasonably likely to correct the alleged misconduct." 27 WSULR 397, Western State University Law Review, WITHOUT WARNING--THE DANGER OF PROTECTING "WHISTLEBLOWERS WHO DON'T BLOW THE WHISTLE".

complaints began long before her termination was even considered;
she was not fired the day following her compliance complaints,
and Quest's proffered reasons for her termination constitute a
serious list of ongoing performance problems.

Therefore, based upon a review of the relevant case law and
the undisputed facts of this case, and mindful that courts should
view recognizing new public policy with the utmost
circumspection, it appears the court should not accept the
plaintiff's invitation to expand public policy, and instead
should grant judgment to the defendant as a matter of law.

### BREACH OF CONTRACT

Greene claims that Quest issued various handbooks, manuals,
policies and procedures which provided "that (1) employees would
receive corrective action in the form of verbal, written and
final written warnings, as well as performance improvement plans,
prior to termination; (2) employees would only  be terminated for
'good cause'; and (3) employees would not be terminated for
making complaints regarding illegal or unethical activities."
(Complaint ¶ 25).  Additionally Greene alleged that the language
in the handbooks, manuals, and policies is couched in mandatory
terms such that it created a contract for employment which served
to alter the at-will employment relationship between Greene and
Quest.  (See Complaint ¶ 26).

23

Generally, an employer may terminate an at-will employee for any reason or no reason and will not be subjected to a breach of employment contract claim. <u>Conner v. City of Forest Acres</u>, 348 S.C. 454, 560 S.E.2d 606 (2002). Because an employee handbook may create a contract, the issue of existence of an employment contract is proper for a jury when its existence is questioned and evidence is either conflicting or admits of more than one inference. <u>Fleming v. Borden</u>, 316 S.C. 452, 460, 450 S.E.2d 589, 594 (1994); <u>Small v. Springs Industries</u>, 292 S.C. 481, 357 S.E.2d 452 (1987). An employee manual that contains promissory language and a disclaimer is "inherently ambiguous," and a jury should interpret whether the manual creates or alters an existing contractual relationship. <u>Fleming</u>, 316 S.C. at 463-464, 450 S.E.2d at 596.

Here, Quest's manual gives employees only a guide regarding their employment without altering the at-will employment relationship. The manual contained a conspicuous disclaimer (See, Def. ex O Employee Handbook Disclaimer Page) in the front of the handbook. The document, entitled "Employment Relationship" in large bold letters, states that the manual "is not a legal document or a contract of employment." (<u>See</u>, <u>id.</u>). The document goes on to state "Quest Diagnostics is an at-will employer. This means either you or the company may terminate the employment relationship at any time and for any reason, with

24

or without cause." (See, id.).  The page setting forth the
disclaimer contains no other materials.  Further, the
disciplinary policies contain only permissive language and do not
provide for mandatory progressive discipline.  The Employee
Handbook states "Quest Diagnostics and its employees may
terminate the employment relationship at any time, with or
without cause."  Id.  Additionally, the Employee Handbook
provides that the disciplinary measures to be taken "generally
include" a verbal warning, a written warning or a performance
improvement plan (probation).  Id.  In addition to the
disciplinary measures outlined in the Employee Handbook, Quest
also utilizes a reprimand in serious misconduct situations and a
final written warning in some cases.  (Cashwell Tr. 39-46; Mercer
Tr. 20-25).  The Quest decision makers did not provide Greene a
final written warning because of her extensive performance
problems at the PSC and the Handbook did not obligate them to do
so.  The Employee Handbook does not require that the disciplinary
measures be taken in any order or that they be progressive in
nature.  (See, Id.; def. Ex. P (Employee Handbook Disciplinary
policy).

In Horton v. Darby Electric Co., Inc., 599 S.E.2d 456,
460-61 (S.C. 2004), the South Carolina Supreme Court held that
the employer's conspicuous disclaimer, coupled with the absence
of any mandatory language or a mandatory progressive discipline

policy, did not alter the at-will relationship between the
employer and employee.  Likewise, here it appears that the Quest
Employee Handbook did not alter the at-will relationship between
Greene and Quest.

Greene also asserts that language in Quest's Compliance
Policy Handbook constitutes a promise sufficient to give rise to
a contract of employment, which language states: "There will be
no repercussions to you for having reported in good faith any
suspected misconduct or non-compliance."  (See, Def. Ex. Q
(Compliance Policy Handbook, p. 3)).  However, in Bookman v.
Shakespeare Co., 442 S.E.2d 183 (S.C.App. 1994), the employer
distributed a sexual harassment policy that promised employees
filing a sexual harassment complaint would be free from
retaliation or reprisal.  The court indicated that the single
promise in the employer's sexual harassment policy was
insufficient to alter the at-will employment relationship.  Id.
at 184.  Again, it appears that the Quest compliance Policy
Handbook  did not alter the at-will relationship between Greene
and Quest.  Greene's cause of action for breach of contract
should fail.

### BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT

In order to establish a claim for breach of contract
accompanied by fraudulent act, a plaintiff must prove three
elements: (1) breach of a contract; (2) fraudulent intent

26

relating to the breaching of the contract and not merely in its making; and (3) a fraudulent act accompanying the breach.  See, Conner, 560 S.E.2d at 612 (setting forth the elements of the claim); Harper v. O.A. Ethridge, 348 S.E.2d 374, 378 (S.C. App. 1986); Floyd v. Country Squire Mobile Homes, Inc., 336 S.E.2d 502, 503-04 (S.C. App. 1985).  Since Greene cannot establish the existence of a contract altering her at-will employment status, she cannot establish the first element of this cause of action, entitling Quest to judgment as a matter of law.

### CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendant's summary judgment motion be granted and this matter ended.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

June 19, 2006