IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Hattie Mae Greene, | ) | |
| | ) | |
| Plaintiff, | ) | C/A No. 2:05-CV-00811-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Quest Diagnostics Clinical | ) | |
| Laboratories, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Magistrate Judge Robert S. Carr's Report and Recommendation ("Report") that this court grant defendant's motion for summary judgment. Plaintiff has filed timely objections to the magistrate judge's Report.

**I.    BACKGROUND**

Plaintiff began her employment in 1997 with defendant's predecessor, SmithKline Beecham. In 1998, she became a phlebotomist and continued in that position after defendant took over SmithKline Beecham's operations in 1999. Plaintiff's duties primarily included drawing blood from patients, completing paperwork, and computer data entry. Plaintiff worked continuously as a phlebotomist with defendant until her termination in 2004.

Defendant utilized its phlebotomists in two capacities. First, defendant contracted with doctors to place phlebotomists in the doctors' offices. The doctors were thus defendant's clients. Under this arrangement, the phlebotomists would draw patients' blood, collect the specimen, and complete the billing paperwork. Although the

1

phlebotomists reported to the doctors' offices for work each day, they were still subject to defendant's rules and regulations. This arrangement was known as an In Office Phlebotomy (IOP) site. Second, defendant employed phlebotomists in its Patient Service Center (PSC). The PSC was a central location operated by defendant to which doctors could refer patients for blood collection and testing.

During her employment with defendant, plaintiff received three separate manuals and policies that she claims operated as contracts between her and defendant. The first document is defendant's Employee Handbook. The handbook contains a disclaimer in bold print on the first page immediately following the table of contents, which reads in pertinent part:

### EMPLOYMENT RELATIONSHIP

**Quest Diagnostics developed this handbook to tell you about the company's current policies and procedures. It is not a legal document or a contract of employment.**

**Quest Diagnostics is an "at-will employer." This means either you or the company may terminate the employment relationship at any time and for any reason, with or without cause.**

(Def. Mot. Ex. O.) The handbook sets out a standard progressive discipline policy by which employees are generally to be disciplined by increasingly harsh levels of action, ranging from verbal warnings, written warnings, and probation to eventual termination. The handbook also states, "Suspension, discharge, and other types of disciplinary action may be taken at any time in the process when appropriate under the circumstances." (Def. Mot. Ex. P.)

2

The second document is defendant's Phlebotomy Performance Policy. This document provides a progressive discipline policy that is used when employees commit phlebotomy errors (e.g., mislabeling specimens). Depending on the type of error, the policy provides for a structured discipline procedure based on the number of errors, with actions ranging from verbal notices to eventual termination. (Cashwell Dep. Ex. 2-A). The policy did not state that it was the exclusive method by which an employee may be terminated.

The third and final document is defendant's Compliance Manual. The manual gives employees guidance on how to report misconduct. The manual also provides a non-retaliation policy for employees who report misconduct by other employees. The relevant portion states, "There will be no repercussions to you for having reported in good faith any suspected misconduct or non-compliance." (Def. Mot. Ex. Q.) Neither the Phlebotomy Performance Policy nor the Compliance Manual contain disclaimers.

In 2000, Kimberly Cashwell became plaintiff's immediate supervisor. Cashwell reported to Toni Seeley, the manager for defendant's operations in South Carolina who worked in the Columbia, South Carolina office. Cashwell gave defendant performance reviews in 2000, 2001, and 2002. Each of those reviews gave plaintiff's performance a rating of 3 on a scale of 5. These were regarded as good reviews, and Cashwell stated in her deposition that plaintiff was a "good phlebotomist." (Cashwell Tr. 34)

On April 1, 2003, Cashwell conducted a site visit to the Low Country IOP site where plaintiff was working. While at that office, the client reported to Cashwell that it was unhappy with plaintiff's performance. Specifically, defendant claims the client

reported that plaintiff took an hour instead of the allowed thirty-minutes for lunch, she took breaks at the scheduled time regardless of her workload and refused to be flexible about when she took those breaks, she used the client's copier for personal use, and she refused to lower the volume of her cellular phone's ring. Additionally, Cashwell learned that plaintiff gave a copy of defendant's confidential break policy to the client.

Plaintiff claims that the Low Country staff asked her to do work that was not within her duties, such as pulling charts, cleaning the kitchen, and entering ICD-9 diagnosis codes. Plaintiff refused to enter the ICD-9 codes because she was not a physician, an action consistent with the Compliance Manual. (Cashwell Tr. 129) Plaintiff states that she saw other Quest phlebotomists enter ICD-9 codes while at Low Country. Plaintiff claims she reported this misconduct both Cashwell and Seeley as it occurred.

Two days after the on-site visit, Low Country told both Cashwell and Seeley that it wanted plaintiff removed from the office right away. Cashwell apparently met with plaintiff, and plaintiff at that time told Cashwell about problems she was having at Low Country and reported that other phlebotomists were entering ICD-9 codes. On April 9, 2003, Cashwell disciplined plaintiff in the form of a written notice for providing the confidential break policy to Low Country.

Sometime thereafter, defendant reassigned plaintiff to the Charleston Women's Clinic (CWC) IOP. Plaintiff claims that, while at CWC, she saw at least one Quest phlebotomist enter ICD-9 codes. Plaintiff asserts that she reported that misconduct to both Cashwell and Seeley. Plaintiff also asserts that CWC wanted her to answer phones, to use the office computers to get patient information, and to fill out requisition forms–all

4

of which she refused to do. Plaintiff claims she reported CWC's requests to Cashwell.

On January 14, 2004, the Quest sales agent who handled the CWC account sent an e-mail to defendant's managers stating that the client was dissatisfied with plaintiff's performance. In an e-mail sent four days later, the sales agent reported that CWC complained that plaintiff was talking on her cellular phone in front of a patient, playing the radio loudly and singing in front of patients, reading personal material at times when she should have been working, and taking food from the kitchen that did not belong to her. At some point, Cashwell and Allison Mercer, a Senior Human Resources Generalist in the Atlanta office, had a conference call with plaintiff. Plaintiff claims that she once again reported CWC's requests and that other Quest phlebotomists were entering ICD-9 codes.

In mid-January 2004, as a result of the problems at CWC, defendant assigned plaintiff to the Charleston PSC. Shortly thereafter, plaintiff claims she saw another phlebotomist enter ICD-9 codes and reported that misconduct to Cashwell. Plaintiff also telephoned Mercer and reported that phlebotomists were entering ICD-9 codes. Mercer thanked plaintiff for the call. A compliance officer then called Cashwell and advised her that plaintiff made a complaint. Over the next month, Cashwell and another employee reviewed over five-hundred forms to ensure the phlebotomists did not make any errors. Plaintiff asserts Cashwell became very unfriendly and hostile towards her after this incident.

On January 27, 2004, Cashwell gave plaintiff a written warning pertaining to the complaints made against her while at the CWC IOP. Around February 9, 2004, plaintiff

5

used the words "Jesus Christ" in front of a patient after making an error on the computer.

The next day, Cashwell and Mercer suspended plaintiff. On February 12, 2004, plaintiff's

employment was terminated.

Plaintiff filed this action, stating three causes of action: (1) wrongful discharge in

violation of public policy, (2) wrongful discharge for breach of an employee handbook,

and (3) breach of contract accompanied by a fraudulent act. First, she claims wrongful

discharge in violation of public policy based on the theory that she was fired for

internally reporting wrongdoing that violated company policies  that was illegal under

various state and federal laws (including prohibitions on the unauthorized practice of

medicine).[1] Second, she claims that she was wrongfully discharged because defendant

breached the contracts created by the handbooks and policies she received during the

course of her employment. Finally, she claims that defendant committed a breach of

contract accompanied by a fraudulent act in the course of terminating her employment.[2]

Defendant moved for summary judgment pursuant to Federal Rule of Civil

Procedure 56. The magistrate judge recommended that this court grant defendant's

---

[1]Plaintiff argues that four state and federal laws provide a mandate for the public policy asserted as the basis of her wrongful discharge claim. These laws include prohibitions on the unauthorized practice of medicine under S.C. Code Ann. §§ 40-47-60, -200, -260 (2005); prohibitions on fraud in dealings with publicly-funded healthcare programs under 42 U.S.C. §§ 1320a-7b, 1395nn(a) (2006); and the False Claims Act, 31 U.S.C. §§ 3729-3733 (2006). (Pl. Obj. 3-4.) Plaintiff alleges these statutes provide a clear mandate of public in this case because she reported conduct that she alleges is illegal under these laws. (Pl. Obj. 5.)

[2]The amended complaint also included a cause of action for breach of the implied covenant of good faith and fair dealing. Plaintiff's counsel withdrew this as a cause of action at the hearing before the magistrate judge on defendant's motion. (Hrg. Tr. 2.)

motion for summary judgment. Plaintiff has filed objections to the Report and

Recommendation, which are discussed below.

**II.**     **STANDARD OF REVIEW**

This court is charged with conducting a <u>de novo</u> review of any portion of the

magistrate judge's Report and Recommendation to which a specific, written objection is

made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the

conclusions of the magistrate judge. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). This court

is not required to review, under a <u>de novo</u> standard, or any other standard, the factual

findings and legal conclusions of the magistrate judge to which the parties have not

objected. <u>See</u> <u>id.</u> at 149-50. A party's general objections are not sufficient to challenge a

magistrate judge's findings. <u>Howard v. Sec. of Health & Human Servs.</u>, 932 F.2d 505,

508-09 (6th Cir. 1991). The recommendation of the magistrate judge carries no

presumptive weight, and the responsibility to make a final determination remains with

this court. <u>Mathews v. Weber</u>, 423 U.S. 261, 270-71 (1976). This court may accept,

reject, or modify the Report and Recommendation of the magistrate judge, in whole or in

part, or may recommit the matter to him with instructions for further consideration. 28

U.S.C. § 636(b)(1).

**III.**     **ANALYSIS**

Summary judgment is appropriate when, after considering the full evidentiary

record, there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). When the party

moving for summary judgment does not bear the ultimate burden of persuasion at trial,

the burden for summary judgment may be discharged by "pointing out to the court that

there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v.</u>

<u>Catrett</u>, 477 U.S. 317, 325 (1986). Evidence should be viewed in the light most favorable

to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

However, a "mere scintilla" of evidence will not preclude summary judgment. The

court's inquiry is "not whether there is literally no evidence, but whether there is any

[evidence] upon which a jury could properly . . . find a verdict for the party" opposing

summary judgment. <u>Id.</u> at 251.

Plaintiff has objected to the magistrate judge's recommendation that defendant's

motion for summary judgment be granted on all three causes of action: (1) wrongful

discharge in violation of public policy, (2) wrongful discharge for breach of an employee

handbook, and (3) breach of contract accompanied by a fraudulent act.

### a.        Wrongful Discharge in Violation of Public Policy

The magistrate judge concluded that plaintiff could not, as a matter of law,

maintain her claim for wrongful discharge in violation of public policy because her

situation, even if all inferences were drawn in her favor, is not within the recognized

limits of the public policy exception in South Carolina. Plaintiff objects to the magistrate

judge's conclusion on the grounds that South Carolina law does, or should, recognize her

claim as falling within the public policy exception to employment at-will.

South Carolina recognizes a public policy exception to the employment at-will

doctrine. <u>See</u> <u>Ludwick v. This Minute of Carolina, Inc.</u>, 287 S.C. 219, 224-25, 337 S.E.2d

213, 216 (1985). "Where the retaliatory discharge of an at-will employee constitutes

violation of a clear mandate of public policy, a cause of action in tort for wrongful

8

discharge arises." Id. at 225, 337 S.E.2d at 216. The South Carolina Supreme Court has expressly recognized at least two situations in which an action for wrongful discharge in violation of public policy can be maintained: (1) when an employer requires an employee to violate a criminal law as a condition of maintaining employment, see id. at 221-225, 337 S.E.2d at 214-216, and (2) when the act of terminating an employee is itself in violation of a criminal law, see Culler v. Blue Ridge Elec. Coop., Inc., 309 S.C. 243, 246, 422 S.E.2d 91, 92-93 (1992). Because plaintiff has not alleged that she was required to violate a criminal law or that her termination itself was in violation of a criminal law, her claim does not fit within the currently recognized bounds of the public policy exception.

The South Carolina courts have been careful to narrowly interpret the exception, often declining to extend the exception beyond the bounds of Ludwick and Culler. See, e.g., Epps v. Clarendon County, 304 S.C. 424, 426, 405 S.E.2d 386, 387 (1991) (declining to extend the exception "where . . . the employee has an existing remedy for a discharge which allegedly violates rights other than the right to employment itself"); Antley v. Shepherd, 340 S.C. 541, 551, 532 S.E.2d 294, 299 (Ct. App. 2000) (declining to extend the exception to situations where the employee was terminated for refusing to do something he believed would, but did not in fact, violate the law); Miller v. Fairfield Cmtys., Inc., 299 S.C. 23, 26-27, 382 S.E.2d 16, 19 (Ct. App. 1989) (declining to extend the exception to situations where the employee was terminated for refusal to act that would result in civil sanctions).

Plaintiff points to a series of cases that she argues indicate the South Carolina courts' willingness to expand the public policy exception. In Culler, the supreme court

stated that the public policy exception is not necessarily limited to situations involving

violations of a criminal statute, but rather applies to any "violation of a clear mandate of

public policy." 309 S.C. at 245-46, 422 S.E.2d at 92. In two subsequent cases, the

supreme court and court of appeals did not extend the public policy exception, but neither

did they foreclose the possibility of doing so. The courts instead refused to determine

whether the cases fit into the exception because, in their procedural postures (a motion to

dismiss under S.C. R. Civ. P. 12(b)(6)), it was not appropriate to decide the "novel issue"

each case presented . See Garner v. Morrison Knudsen Corp., 318 S.C. 223, 226-27, 456

S.E.2d 907, 909-10 (1995); Keiger v. Citgo, Coastal Petroleum, Inc., 326 S.C. 369, 373,

482 S.E.2d 792, 794 (Ct. App. 1997). Plaintiff also points to Evans v. Taylor Made

Sandwich Co., in which the court of appeals affirmed a jury verdict in favor of plaintiff

on a wrongful discharge in violation of public policy claim where the employer fired the

employee in retaliation for filing complaints with the South Carolina Department of

Labor. 337 S.C. 95, 522 S.E.2d 350 (Ct. App. 1999). While Evans did not expressly

expand the exception, the court of appeals was willing to defer to the jury's judgment on

the issue. See id. at 103, 522 S.E.2d at 353-54.

Plaintiff argues that this court should, given these cases, expand the public policy

exception to encompass situations where employees internally report alleged illegal

conduct to their superiors.[3] Her argument is unpersuasive. Although Keiger and Garner

---

[3]Plaintiff additionally asserts that Nolte v. Gibbs Int'l, Inc., 335 S.C. 72, 515
S.E.2d 101 (Ct. App. 1999) supports reversing the magistrate judge's recommendation.
In Nolte, the court of appeals held that the plaintiff could maintain and action for
wrongful discharge in violation of public policy, thereby reversing the trial court's grant
of summary judgment to defendant. Id. at 75, 515 S.E.2d at 103. In addition to retaliation

leave open the possibility that the court may have expanded the exception in each case

under a different procedural posture, the fact remains that the courts in those cases did

not actually expand the exception to encompass plaintiff's or any other type of claim.

Further, even assuming that Evans can be read to say that the question of whether a

termination violates public policy should or could be decided by a jury, that holding may

be negated by the court's subsequent decision in Antley. In Antley, the court of appeals

affirmed, on a motion for summary judgment, the trial court's refusal to extend the

exception to termination for refusing to do tasks that the employee believed to be, but

were not in fact, illegal.[4] See Antley, 340 S.C. at 550, 532 S.E.2d at 298. Finally, Culler

cannot be interpreted to require expansion of the  exception to cover this case. Culler

stated that, even though the exception is not limited to the situations described in

Ludwick and Culler itself, the termination must always violate a clear mandate of public

policy. Culler, 309 S.C. at 245, 422 S.E.2d at 92. Plaintiff in this case has not pointed to

any law or other source that constitutes a clear public policy supporting the rights of

---

for internal reporting, the plaintiff in Nolte also alleged that his employer asked him to
violate federal criminal laws and that his acquiescence in the employer's illegal activity
could make the plaintiff criminally liable. See id. at 75, 515 S.E.2d at 103. Plaintiff has
not alleged that she was ever requested to engage in illegal activity, nor has she provided
any evidence that acquiescence in others' illegal activities would make her criminally
liable. Nolte therefore does not provide a ground for reversing the magistrate judge's
recommendation.

[4]The magistrate judge distinguished Evans on the grounds that case involved
external reporting of unlawful activity to a government agency while this case involves
internal reporting of unlawful reporting within the corporation. This remains a viable
basis for distinguishing Evans. The laws of the state, inherent in establishing the
administrative agency and complaint procedures, support and encourage reporting of
wrongful behavior to those agencies. Internal reporting within a business has no similar
support.

employees to internally report potentially illegal conduct to their superiors.

Because plaintiff's claim does not fall within the recognized bounds of the public policy exception to at-will employment and the court declines to extend the exception's current limits, the magistrate judge correctly concluded that plaintiff's claim for wrongful discharge cannot be maintained as a matter of law.

### b. Wrongful Discharge/Breach of Contract

The magistrate judge's Report recommended granting summary judgment to defendant on plaintiff's breach of contract claim. The magistrate judge concluded that the documents provided to plaintiff did not constitute contracts sufficient to alter the employment at-will relationship. Plaintiff disagrees with the magistrate judge's conclusion, objecting on the ground that the Employee Handbook, the Compliance Manual, and the Phlebotomy Performance Policy each contain language that altered the employment at-will relationship. Plaintiff further maintains that defendant breached those contracts in the course of terminating her employment.

South Carolina recognizes an "employee handbook" exception to employment at-will. See Conner v. City of Forest Acres, 348 S.C. 454, 464, 560 S.E.2d 606, 610 (2002). "[W]here the at-will status of the employee is altered by the terms of an employee handbook, an employer's discharge of an employee may give rise to a cause of action for wrongful discharge." Id. The stated policy supporting this exception is that "[i]t is patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow him to ignore these very policies as 'a gratuitous, nonbinding statement of general policy' whenever it works to his

12

disadvantage." <u>Small v. Springs Indus., Inc.</u>, 292 S.C. 481, 485, 357 S.E.2d 452, 455 (1987).

**1.      Whether the handbook and policies were binding promises.**

The issue of whether an employee handbook is a contract that alters the employee's at-will status should be decided by a jury when the "contract's existence is questioned and the evidence is either conflicting or is capable of more than one inference." <u>Hessenthaler v. Tri-County Sister Help, Inc.</u>, 365 S.C. 101, 108, 616 S.E.2d 694, 697 (2005). However, "a 'court should intervene to resolve the handbook issue as a matter of law . . . if the handbook statements and disclaimer, taken together, establish beyond any doubt that[t] an enforceable promise does or does not exist." <u>Id.</u> (alterations in original) (quoting <u>Fleming v. Borden, Inc.</u>, 316 S.C. 452, 464, 450 S.E.2d 589, 596 (1994)). <u>Hessenthaler</u> thus indicates that judgment as a matter of law would be inappropriate when there is no disclaimer or when the language is mandatory rather than permissive.

In this case, the magistrate judge correctly recommended granting summary judgment to defendant on the issue of whether the Employee Handbook is a contract because it contained both a conspicuous disclaimer and permissive language. The Employee Handbook contained a disclaimer on the first page that appeared in bold print. The disclaimer stated unequivocally that the handbook "is not a legal document or a contract of employment." The title, "Employment Relationship," appeared in capital letters. Thus, this disclaimer was sufficiently clear as to be conspicuous as a matter of law. <u>See</u> <u>Hessenthaler</u>, 365 S.C. at 108-09, 616 S.E.2d at 697-98 (holding a disclaimer

13

that appeared in bold, capitalized letters on the first page of the handbook to be conspicuous as a matter of law).

The magistrate judge also correctly concluded that the language of the handbook's progressive discipline policy was not sufficiently mandatory to create a binding promise. The handbook clearly stated, "Suspension, discharge, and other types of disciplinary action may be taken at any time in the process when appropriate in the circumstances." Moreover, the handbook qualifies the disciplinary procedure by stating only that the steps "generally include" a verbal warning, a written warning, and probation. Because the disclaimer was conspicuous and the language was permissive, the magistrate judge correctly concluded that the statements and disclaimer, taken together, establish that the handbook is not a binding promise.[5]

Unlike the handbook, the Compliance Manual and Phlebotomy Performance Policy do not contain disclaimers. As noted supra, the South Carolina Supreme Court has clearly stated that when there is a dispute over whether language in a handbook or other document creates a binding promise, particularly in the absence of a disclaimer, that dispute should be resolved by a jury.[6] See Hessenthaler, 365 S.C. at 108, 616 S.E.2d at

---

[5]This conclusion is also consistent with the South Carolina Supreme Court's decision in Horton v. Darby Elec. Co., Inc., 360 S.C. 58, 599 S.E.2d 456 (2004). In Horton, the court upheld a grant of summary judgment to defendant when the handbook contained a conspicuous disclaimer and permissive, rather than mandatory, language. Id. at 66-69, 599 S.E.2d at 460-61.

[6]Defendant argues that the Compliance Manual cannot alter the employment at-will relationship because a general policy statement cannot be a binding promise in these circumstances. (Def. Resp. 11.) Defendant cites Hessenthaler for this proposition. (Def. Resp. 11.) The court in Hessenthaler held that the employer's equal opportunity policy, which was similar to the the non-retaliation statement here, was merely a "general policy

14

697; <u>Horton</u>, 360 S.C. at 68, 599 S.E.2d at 460; <u>see also</u> <u>McCutcheon v. Wal-Mart Stores,</u>

<u>Inc.</u>, 2006 WL 784759 (D.S.C. Mar. 28, 2006) (holding a jury should decide whether an

employer's non-retaliation statement containing the word "will" is a binding promise).

Because these two documents did not contain disclaimers and there are two possible,

reasonable inferences, a jury should resolve the question of whether they are contracts

that altered the employment at-will relationship.

> **2.    Whether a genuine issue exists as to alleged breach of contract.**

For purposes of determining whether plaintiff's evidence satisfies the <u>Celotex</u>

standard for demonstrating a genuine issue of material fact as to breach of the policies,

the court assumes <u>arguendo</u> that the Compliance Manual and Phlebotomy Performance

Policy contain binding promises.[7]  Even making that assumption, plaintiff has not offered

sufficient evidence to show a genuine issue as to breach of either policy.

Plaintiff has offered no evidence to show that her termination was in breach of the

Phlebotomy Performance Policy. This policy does not state that it is the exclusive method

by which an employee could be terminated (instead, it deals with situations when an

employee could be terminated only for phlebotomy errors). The record demonstrates that

defendant had many reasons other than phlebotomy errors for terminating plaintiff,

---

statement" and not definite or specific enough to alter the employment at-will
relationship. <u>Hessenthaler</u>, 365 S.C. at 110-11, 616 S.E.2d 694, 698-99. However, the
court only made such a determination <u>after</u> concluding that the handbook contained a
conspicuous disclaimer. <u>See</u> <u>id.</u> at 109-10.

[7]Because the magistrate judge concluded that none of the documents provided to
plaintiff were binding promises as a matter of law, he necessarily did not reach this issue.
Defendant argued in its motion for summary judgment that there was no genuine issue as
to breach even if the handbook and policies were contracts. (Def. Mot. Summ. J. 15-18.)

including unsatisfactory customer and patient relations, insubordination, billing errors, and cursing in front of a patient. Had plaintiff provided evidence that the sole reason for her termination was phlebotomy errors, and that her termination was not in compliance with the policy, there may be a genuine issue on this question. But because plaintiff has not done so, there is no evidence supporting a conclusion that her termination was in breach of the Phlebotomy Performance Policy so as to support a claim for wrongful discharge.

Moreover, plaintiff has not offered evidence to show there is a genuine issue as to whether defendant breached the Compliance Manual's anti-retaliation statement. The Compliance Manual stated, "There will be no repercussions to you for having reported in good faith any suspected misconduct or non-compliance." (Def. Mot. Ex. Q.) Thus, to show a genuine issue that defendant breached this provision, plaintiff must offer some evidence that she was terminated because she reported suspected misconduct or non-compliance. Nothing in the record provides any evidence that plaintiff was terminated because of her reporting alleged misconduct to her employer.

As a general matter, a  plaintiff cannot defeat summary judgment by relying on "mere speculation." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Genuineness, including the genuineness of an issue of state of mind, requires that the plaintiff's evidence "create a fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Although a court must take care in considering state of mind on pre-trial motion, that "'does not mean that summary judgment is *never* an appropriate vehicle for resolution.'"

Id. (quoting Intl. Woodworkers of America v. Chesapeake Bay Plywood Corp., 659 F.2d

1259, 1272 (4th Cir. 1981).

Plaintiff argues the evidence that she was a satisfactory employee, combined with

the temporal proximity of her termination to the complaints she made, demonstrate a

genuine issue as to breach of the Compliance Manual. (Pl. Resp. Mot. Summ. J. 14.)

Although there is evidence in the record to demonstrate she was a satisfactory employee,

the record contains overwhelming evidence that she performed poorly in 2003 through

her termination in February 2004 (and there is an absence of a performance review from

2003). Before plaintiff even made her first report of alleged wrongdoing by Quest

employees, defendant had already received complaints from its customers about

plaintiff's performance, one of which demanded she be removed from its office

immediately. These complaints from defendant's customers, who had no knowledge of

plaintiff's reports, resulted in plaintiff's removal from two customers' offices and her

reassignment to the PSC.

As for temporal proximity, plaintiff was not terminated until more than nine

months following her first report to Cashwell of alleged wrongdoing and more than one

month following her last report of alleged wrongdoing. Even then, she was terminated

only after being removed from two clients' offices and reassigned to the PSC. Plaintiff

claimed in her deposition testimony that the reporting of wrongdoing resulted in negative

relations between her and Cashwell, but Mercer, the Senior Human Resources Generalist

based in Atlanta, made the ultimate decision to discharge plaintiff. (Mercer Tr. 47.) The

internal communications between Cashwell and the regional manager indicate that

plaintiff's reporting did not factor into her termination. Finally, there is no evidence that defendant has engaged in systemic retaliation against employees who have reported wrongdoing, nor that any similarly situated plaintiffs were terminated. Cf. International Woodwokers, 659 F.2d at 1272 (stating that summary judgment would not be appropriate on discrimination claim if evidence "suggests a pattern" of discrimination by employer). In sum, plaintiff's evidence amounts to mere speculation that the true reason for terminating her employment was in retaliation for reporting wrongdoing and thus cannot defeat summary judgment. See Felty, 818 F.2d at 1128.

This outcome is consistent with the Fourth Circuit's decision in International Woodworkers of America. That case involved, among other allegations, a claim of employment discrimination under Title VII. Id. at 1261. Under the McDonnell-Douglas framework for establishing a prima facie case of discrimination, the employer offered evidence that it had legitimate business reason for he treatment. Id. at 1271. The specific issue in the defendant's motion for summary judgment was thus whether plaintiff had offered sufficient evidence to demonstrate that the employer's legitimate business reason was merely a pretext for the real, discriminatory motives behind its treatment of her. See id. The court held that granting summary judgment to the employer was inappropriate because discovery "suggested" a "pattern of discrimination, race- and sex-based harassment" against the plaintiff, as well as other employees, and the employer did not offered a nondiscriminatory explanation for its actions. Id. Plaintiff here has offered nothing to suggest nor has plaintiff alleged that there was an unexplained pattern of retaliation, either against her or others, for reporting allegedly illegal activities and

18

misconduct to her superiors. Moreover, as discussed above, there is more than adequate evidence to show defendant had a non-retaliatory reason for terminating her. In light of that evidence, plaintiff must have offered more evidence than her own speculation that she was fired in retaliation for reporting misconduct.[8]

In support of her argument, plaintiff points to the South Carolina Court of Appeals' decision in Connelly v. Wometco Enterprises, Inc., 314 S.C. 188, 442 S.E.2d 204 (Ct. App. 1994). In Connelly, an employee sued her former employer, claiming she was wrongfully discharged for obeying a jury summons. Id. at 189, 442 S.E.2d at 205. The plaintiff in Connelly offered evidence that she was fired the same day she returned from jury duty as well as evidence that she was a good employee. At trial, the employer moved for summary judgment, arguing plaintiff had offered no direct evidence that she was terminated for obeying the jury summons (defendant had claimed plaintiff was terminated for unsatisfactory performance). Id. at 190, 442 S.E.2d at 205-06. The trial judge denied the motion for summary judgment, and subsequently denied the employer's motion for directed verdict. Id. at 190, 442 S.E.2d at 206. The jury subsequently found for the employee. Id. at 191, 442 S.E.2d at 206. The Court of Appeals affirmed, holding

---

[8]In Millner v. Fieldcrest Mills, Inc, 915 F.2d 1565 (Table), 1990 WL 143608 (4th Cir. 1990), an employee sued his employer for violation of Title VII, alleging he was denied promotions in retaliation for reporting the employer to the EEOC in other matters. Id. at *1-2. The court held the district court properly granted summary judgment because the employee offered no direct evidence of retaliation and "he could not substantially contest Fieldcrest's [non-retaliatory] reasons for not promoting him." Id. at *3. The court also stated that showing the employer knew of his EEOC activity was not enough to demonstrate a genuine issue as to retaliation. Id. As in Millner, plaintiff here has offered no direct evidence of retaliation, has not substantially contested defendant's non-retaliatory justifications for discharging her, and has shown only that management knew of her reporting.

that the timing of the discharge combined with evidence of satisfactory performance was sufficient to support the jury's verdict. Id.

Connelly is distinguishable from this case for two reasons. First, in Connelly, the plaintiff was fired the very day she returned from jury duty. In this case, the plaintiff's termination, as noted supra, came more than nine months after the initial report of wrongdoing and more than one month after her last report of wrongdoing–and even then only after being removed from two clients' offices and reassigned to the PSC where she cursed in front of a patient. Second, while the plaintiff in Connelly also produced evidence that she was a good employee, the court of appeals' opinion does not indicate that defendant produced any evidence that she was a poorly performing employee. Thus, the only reasonable inference in Connelly–given the lack of evidence indicating the plaintiff was a bad employee and the immediacy of her termination–was that she was terminated for obeying a jury summons. In this case, the record contains ample evidence that plaintiff performed unsatisfactorily. Retaliation against plaintiff is therefore only a mere possibility and any inferences that may be drawn are based only on plaintiff's speculation, which cannot defeat a motion for summary judgment. See Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir. 1982).

**b.     Breach of Contract Accompanied by a Fraudulent Act**

Plaintiff argues that because the handbooks and policies were binding contracts, the magistrate judge incorrectly concluded that her claim for breach accompanied by a fraudulent act could not be maintained. This argument is premised on plaintiff's assumption that the magistrate judge erred in holding that the handbook and policies

were not contracts.

To recover for breach of contract accompanied by a fraudulent act, a plaintiff must show: "(1) a breach of contract; (2) fraudulent intent relating to the breach of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." Harper v. Ethridge, 290 S.C. 112, 119, 348 S.E.2d 374, 378 (Ct. App. 1986) (citing Floyd v. Country Squire Mobile Homes, Inc., 287 S.C. 51, 336 S.E.2d 502 (Ct. App. 1985)).

Because the magistrate judge correctly concluded that the Employee Handbook was not a binding contract, plaintiff necessarily cannot base a claim of breach accompanied by a fraudulent act on a document that is not a contract at all. Further, because plaintiff has failed to demonstrate a genuine issue that defendant breached the other policies (even assuming they were binding contracts), plaintiff has also failed to demonstrate a genuine issue as to breach for purposes of this cause of action.

## IV.    CONCLUSION

For the reasons stated above and in the magistrate judge's Report and Recommendation, it is therefore **ORDERED** that defendant's motion for summary judgment be **GRANTED**.

**AND IT IS SO ORDERED.**

_____

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 29, 2006**
**Charleston, South Carolina**

21